IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| CACI, INC. – FEDERAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-000478 |
| | ) | |
| UNITED STATES NAVY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF CACI, INC. – FEDERAL'S MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................................1

II.     BACKGROUND ................................................................................................................2

    A.      CACI and the Benefits of its ADCS Software ...............................................................2

    B.      The Insights That Led to ADCS ......................................................................................3

    C.      The Trade Secrets That Power ADCS .............................................................................6

    D.      CACI's Measures to Protect the Trade Secrets ..............................................................7

        1.      CACI's Technical Security Measures .........................................................................7

        2.      CACI's Confidentiality Markings ...............................................................................8

        3.      CACI's Communications with USN Regarding the Confidential Nature of the Trade Secrets ...................................................................................................................8

        4.      CACI Foregoes Commercial Opportunities That Would Require Disclosing the Trade Secrets ...................................................................................................................9

        5.      Previous Threats to the Trade Secrets Confirm that USN Appreciated That ADCS Contained Trade Secrets ........................................................................................10

    E.      The Ongoing Improper Use and Dissemination of the Trade Secrets and USN's Utter Disregard for its Duty to Respond .....................................................................................11

III.    THE APPLICABLE LEGAL STANDARDS .................................................................18

    A.      The Preliminary Injunction Standard ...........................................................................18

    B.      The Administrative Procedures Act (APA) ...................................................................19

    C.      The Trade Secrets Act ...................................................................................................20

IV.    ARGUMENT ...................................................................................................................22

    A.      CACI's TSA Claim for Injunctive Relief is Reviewable Under the APA ...................22

    B.      CACI Is Likely to Succeed on the Merits of its TSA Claim ........................................23

        1.      CACI Holds Valuable, Protectable Trade Secrets in the ADCS Database Schema and the Information That Can Be Gleaned From It ...........................................................23

        2.      USN Wrongfully Used and Disclosed the Trade Secrets ..........................................26

    C.      CACI Is Likely to Suffer Irreparable Harm Absent an Injunction ..............................27

    D.      The Balance of Equities Tips Heavily in CACI's Favor ..............................................29

    E.      Injunctive Relief Is in the Public Interest .....................................................................30

V.     CONCLUSION ................................................................................................................30

Page(s)

**Cases**

*Amarasinghe v. Quinn*,
   148 F. Supp. 2d 630 (E.D. Va. 2001)................................................................19

*API Tech. Servs., LLC v. Francis*,
   No. 4:13-cv-142, 2013 WL 12131381 (E.D. Va. Dec. 4, 2013)............................29

*Ayers v. U.S. Dep't of Def.*,
   No. 7:18-cv-0032, 2019 WL 4145240 (W.D. Va. Aug. 30, 2019) ........................20

*Blackhawk Indus. Prods. Grp. Unlimited, LLC v. U.S. Gen. Servs. Admin.*,
   348 F. Supp. 2d 662 (E.D. Va. 2004) ....................................................20, 22, 29

*Blades of Green, Inc. v. Go Green Lawn & Pest*,
   LLC, No. SAG-22-00176, 2022 WL 326473 (D. Md. Feb. 3. 2022) ....................18

*CACI v. Field Servs., Inc. v. United States*,
   12 Ct. Cl. 440 (1987)...........................................................................................21

*Cap. One Fin. Corp. v. Sykes*,
   No. 3:20-cv-763, 2021 WL 2903241 (E.D. Va. July 9, 2021) .................19, 28, 30

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .......................................................................................20, 22

*Conax Fla. Corp v. United States*,
   625 F. Supp. 1324, 1327 (D.D.C. 1986)..............................................................28

*Cornwell v. Sachs*,
   99 F. Supp. 2d 695 (E.D. Va. 2000)....................................................................18

*Crowley Gov't Servs., Inc. v. Gen Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022)............................................................................23

*Di Biase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017) ..............................................................................29

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991) ..............................................................................28

*Dowty Decoto, Inc. v. Dep't of Navy*,
   883 F.2d 774 (9th Cir. 1989) .....................................................................21, 22, 27

*Env't Tech. Inc. v. Env't Prot. Agency*,
   822 F. Supp. 1226 (E.D Va. 1993)......................................................................21

ii

*H. Jay Spiegel & Assocs., P.C. v. Spiegel,*
    652 F. Supp. 2d 630 (E.D. Va. 2008) ........................................................................ 18, 19

*Home Funding Grp., LLC v. Myers,*
    No. 1:06cv1400 (JCC), 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) .................................27

*List Interactive, Ltd. v. Knights of Columbus,*
    No. 17-CV-00210-RBJ, 2019 WL 2248547 (D. Colo. May 24, 2019)................................21

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) .................................................................... 20, 22, 27

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,*
    756 F.2d 1048 (4th Cir. 1985) ..............................................................................29

*Mgmt. Sci. Am., Inc. v. Pierce,*
    598 F. Supp. 223, 231 (N.D. Ga. 1984)...................................................................21

*MicroStrategy Inc. v. Bus. Objects, S.A.,*
    331 F. Supp. 2d 396 (E.D. Va. 2004) .....................................................................24

*Salient CRGT, Inc. v. Sols. By Design II, LLC,*
    No. 1:20-cv-236, 2020 WL 3550008 (E.D. Va. Apr. 2, 2020).............................................18

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) .................................................................................28

*Shurland v. Air Force Bd. for Corr. of Mil. Recs.,*
    No. 3:18cv770, 2019 WL 5410064 (E.D. Va. Sept. 24, 2019)............................................20

*Stewart v. Lee,*
    No. 1:16-cv-213 (LMB/JFA), 2016 WL 8345463 (E.D. Va. June 15, 2016)........................19

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.,*
    299 F. Supp. 2d 565 (E.D. Va. 2004) .....................................................................25

*Variable Annuity Life Ins. Co. v. Coreth,*
    535 F. Supp. 3d 488 (E.D. Va. 2021)......................................................................18

*Versata Software, Inc. v. Internet Brands Inc.,*
    902 F. Supp. 2d 841, 852 (E.D. Tex. 2012).................................................................21

**Statutes**

5 U.S.C.
    § 702 ...................................................................................................................... 19
    § 704 ...................................................................................................................... 19
    § 706 (2)(A) .................................................................................................... 20, 22
    § 706(a)(2) ............................................................................................................ 20

18 U.S.C.
    § 1839 (3)(A) ........................................................................................................ 24
    § 1839 (3)(B) ........................................................................................................ 21
    § 1905 ............................................................................................................... 20, 22

Administrative Procedures Act .................................................................................. *passim*

Trade Secrets Act ...................................................................................................... *passim*

Va. Code § 59.1-336 ................................................................................................ 21, 24

**Other Authorities**

Fed. R. Civ. P. 65 ......................................................................................................... 19

Restatement (Third) of Unfair Competition § 39 cmt. ......................................... 21, 24

Plaintiff CACI, Inc. – Federal ("CACI") respectfully submits this Memorandum in Support of its Motion for a Preliminary Injunction against Defendant United States Navy ("USN").

## I.      INTRODUCTION

For over twenty years, CACI has been the sole-source provider to USN of its proprietary software application, Automated Data Capture System ("ADCS").   ADCS is a user-friendly software system that guides personnel through the aircraft inspection and maintenance process. Because of its use of ADCS, USN has been able to maintain for two decades a highly effective, efficient and safety-focused program for maintaining its aircraft.

Apparently frustrated with USN's sole-source relationship with CACI, certain personnel within USN set out to find an alternative software package.   Those personnel quickly found, however, that no competitor has been able to replicate ADCS's performance.   Rather than acknowledge the superiority of ADCS, however, USN personnel instead responded by improperly accessing the valuable trade secret information that drives ADCS's performance, and then proceeded to wrongfully publish those trade secrets to CACI's competitors, in clear violation of the Trade Secrets Act ("TSA").   Indeed, documents definitively show USN personnel admitting to purposefully extracting and divulging CACI's trade secret, solely for the purpose of replicating ADCS to create a competing product.   Worse still, when brought to the attention of superior officers and legal personnel within USN, those personnel acted with indifference, at one point observing, cavalierly, that they are used to situations where USN's actions go "south."

CACI has spent decades and millions of dollars creating the unique schema that powers ADCS, modeling a complex network of variables so as to reveal, with optimal efficiency, all detectable defects and related issues that exist in the vast array of interconnected components that make up an aircraft.   The final product resulting from that hard work represents innumerable

1

judgment calls and countless creative design choices.  All of that work has culminated, over the course of many years, in a product that is unmatched in the marketplace.  Indeed, the best proof of the uniqueness of CACI's trade secret may be that USN and its contractors simply cannot replicate the performance and functionality of ADCS without first stealing it.

By its Motion, CACI asks the Court to do what CACI begged USN to do in the first instance: halt the wholesale dissemination of its trade secret until the merits of CACI's claims can be adjudicated.  CACI seeks nothing more than the *status quo ante*, so that imminent irreparable harm can be avoided while the merits of CACI's claims are established.  For that reason, the balancing of the harms and the public interest, like the prongs on likelihood of success and irreparable harm, weigh heavily in CACI's favor.

## II.    BACKGROUND

USN has enjoyed the benefits of ADCS, including its associated trade secrets, on a subscription basis since 2002.  Now, after two decades of demonstrating by its conduct that it understood the sensitive nature of CACI's trade secrets, USN has brazenly published that information to CACI's competitors—all for the purpose of rapidly developing a replacement for ADCS.  Further, USN has adopted a profound disdain for its obligation to mitigate the damage it has caused and is causing to CACI, precipitating the need for this lawsuit.

### A.    CACI and the Benefits of its ADCS Software

CACI is an American professional services and information technology company that offers its solutions and services to private companies and numerous federal agencies, including USN and other branches of the U.S. Armed Forces.  (Giese Decl. ¶ 2.)  The company employs over 22,000 individuals worldwide, received the "Top Work Places USA" award in 2023, and has been recognized as a "Leading Employer of Veterans" by various publications and organizations, including *Forbes* and the *Military Times*.  (*Id.*)

ADCS, meanwhile, is a highly successful and profitable commercial software program developed by CACI exclusively with private funding. (Kalas Decl. ¶ 4.) It is a user-friendly software system that guides personnel through the aircraft inspection and maintenance process in a highly efficient, effective and safety-focused manner. (*Id.*) USN has used ADCS as its sole-source software for inspecting and maintaining its aircraft for more than two decades. (*Id.* at ¶ 13.) And it has done so for good reason. As early as 2002, USN itself calculated a time savings of between 80% to 100%, depending upon the task involved. (*Id.*)

ADCS is able to achieve those results because it employs a different approach than competitors' solutions, which rigidly require users to follow a pre-determined, linear path through their inspection or maintenance tasks. (*Id.* at ¶ 5.) ADCS instead allows users to begin their work at any point in the inspection and maintenance cycle, and allows them to proceed with confidence knowing that nothing will be missed. (*Id.*) That is because, regardless of where an operator begins their work, ADCS computes a customized, logical set of steps that the operator can follow, emphasizing safety and efficiency as it guides the operator through each and every component that may require attention along the way. (*Id.*)

### B.    The Insights That Led to ADCS

ADCS's benefits are the product of decades of creative work by CACI's software developers. (*Id.* at ¶ 8.) Over that time, CACI has invested millions of dollars in the research and development of its software, and has assigned its most skilled software engineers to perform that work. (*Id.*) As a result of those efforts, ADCS is one of the most important products in CACI's inventory. The application produces substantial annual revenue to the company, and an effort to rebuild the application from scratch—even assuming everything went perfectly and the developers fully understood how to make ADCS function—would come at a very high cost. (*Id.* at ¶ 10.)

Many competitors have tried to emulate ADCS over the years, but none have succeeded.  (*Id.* at ¶ 11.)

Work in connection with ADCS actually began with CACI's predecessor-in-interest, American Management Systems ("AMS"),[1] which created a predecessor application that was briefly commissioned by USN, beginning in or around 1996.  (*Id.* at ¶ 15.)  For that predecessor product, AMS employed a traditional "vertical methodology" approach, whereby programmers take a serial or systemic approach to problem-solving.  (*Id.* at ¶ 16.)  While AMS had built a functioning product, however, it fell far short of the functionality and speed that its developers envisioned or that USN needed.  (*Id.* at ¶ 17.)  Specifically, AMS's product simply was incapable of efficiently handling and connecting the vast network of connections that exist between an aircraft's interrelated components.  (*Id.*)

In or around 2000, at the government's urging, AMS shifted the project to a commercial software development model—that is, software development that was not under contract with USN and relied entirely upon private funding.[2]  (*Id.* at ¶ 41.)  That shift allowed AMS (and, after the 2004 acquisition, CACI) the freedom to offer the resulting commercial computer software to other customers under a subscription.  (*Id.* at ¶ 42.)  Under those conditions, the development team began rewriting the application from scratch to try to develop a more successful product.  (*Id.* at ¶ 18.)  In engaging in those efforts, the developers again took a vertical approach to the development of the software, and again found that such an approach was unable to accommodate the thousands of different variables that needed to be considered.  (*Id.*)

---

[1] CACI took over AMS in 2004.  (Kalas Decl. ¶ 42.)
[2] The parties' agreements in fact refer to ADCS as "a commercial off the shelf (COTS) software application."  (*Id.* at ¶ 41.)

After some months, the development team made the important breakthrough that led to the highly successful ADCS product.  Instead of a traditional vertical approach, they switched to a "lateral" approach in designing the software's architecture.  (*Id.* at ¶ 19.)  The concept of a "lateral" methodology has been around since the late 1960s.  (*Id.* at ¶ 20.)  As far as the developers were aware, however, no one had ever implemented a lateral methodology in software like ADCS.  (*Id.* at ¶ 19.)

Fundamentally, lateral methodology is an approach to problem-solving that involves leveraging a complex, interconnected, interdependent network of virtual elements to process information and efficiently arrive at the best solution.  (*Id.* at ¶ 21.)  Such an approach is highly complex because, as the number of components increases, so too does the number of relationships between them.  (*Id.*)  The result is a set of possible configurations that exponentially grows.  (*Id.*)  AMS's developers believed, however, that because industrial machines such as aircraft are composed of thousands of interconnected, interdependent parts, lateral methodology was the best approach to modeling the complexities that aircraft present.  (*Id.* at ¶ 22.)

Working again entirely at private expense, AMS set out to learn and apply the complicated field of lateral methodology, so as to develop a uniquely effective lateral architecture.  (*Id.* at ¶ 23.)  That initial work took roughly two years to complete and resulted in a new product—ADCS—which was provided to USN on a subscription basis for the first time in 2002.  (*Id.* at ¶¶ 23-24, 43.)  USN continues to use ADCS on an annual subscription basis to this day.  (*Id.* at ¶ 43.)  Over that time, ADCS has been highly successful, providing support to USN's maintenance team at a level that none of CACI's competitors have been remotely able to replicate.  (*Id.* at ¶¶ 4, 11.)

The release of a new product in 2002 was not, however, the end of CACI's privately funded investment in and development of ADCS.  (*Id.* at ¶ 25.)  CACI continues to improve its modeling

at its own expense, in both big and small ways.  (*Id.*)  For example, between 2015 and 2017, CACI rebuilt ADCS from the ground up.  (*Id.*)  That effort involved changing the programming language in which ADCS was originally written, writing more than 175,000 new lines of source code, and totally redesigning the database.  (*Id.*)  By continuing to invest in its product, CACI has not only maintained, but has also greatly enhanced, the lateral methodology architecture that was (and still is) key to the software's value and success in the marketplace.  (*Id.*)

### C.    The Trade Secrets That Power ADCS

ADCS relies upon an organized, indexed collection of information that can be stored, managed, searched and extracted on demand.  (*Id.* at ¶ 27.)  To store and access that information, ADCS uses a type of database called a "relational database."  (*Id.* at ¶ 28.)  As its name suggests, a relational database stores data in tables that are interrelated or contain interrelated data.  (*Id.*)  A complete system of such tables, which defines the types of data within the tables and also the relationships between the tables and the data therein, is called a relational database "schema" (or "data dictionary").  (*Id.*)  In short, the schema is a blueprint for building ADCS's database and understanding how it so effectively manages its data.  (*Id.*)

In the case of ADCS, the database schema lies at the heart of the software and drives much of its value.  (*Id.* at ¶ 37.)  As discussed above, ADCS is designed to leverage the relationships between aircraft components to allow operators to begin their work from any point, with confidence that the path ADCS generates will address every need of the aircraft.  (*Id.*)  To allow that work to be done efficiently, the database schema must be designed to account for every component in every one of the serviced aircrafts, as well as the multitude of relationships and interdependencies between those components.  (*Id.*)

As a result, in developing and refining the database schema for ADCS, CACI's software engineers had to not only map out a complex network of connections, but also make numerous

6

difficult choices about how to define, organize and prioritize all of the data stored within ADCS. (*Id.* at ¶ 38.)  Further, CACI's designers needed to design a database schema that was flexible enough to allow changes to be made—*e.g.*, when a new type of data needed to be captured— without requiring wholesale software upgrades that could cause a loss of functionality or an interruption of service for CACI's customers.  (*Id.*)  In the end, CACI's developers applied their decades of creative work and expertise, fueled by CACI's millions of dollars of investment, to develop a database schema that meets all of those criteria.  (*Id.* at ¶ 39.)  That database schema, along with all of the information that can be gleaned from the database schema (collectively, the "Trade Secrets")[3] contains work of incredible value to CACI.  (*Id.*)  Those Trade Secrets enable ADCS to leverage the power of lateral methodology to produce the agile, efficient, and safety-focused application upon which aircraft inspectors and maintenance operators rely.  (*Id.* at ¶ 40.)  Despite efforts by others, no CACI competitor has been able to unlock the benefits resulting from the Trade Secrets, and, as a result, no one has been able to match what ADCS provides to the marketplace.  (*Id.*)

**D.**    **CACI's Measures to Protect the Trade Secrets**

Precisely because ADCS is so valuable, CACI has gone to great lengths to ensure the security of its Trade Secrets.  (*Id.* at ¶ 47.)  Indeed, before USN's acts of misappropriation, these measures maintained the security of the Trade Secrets for over twenty years.  (*Id.*)

1.    *CACI's Technical Security Measures*

Within CACI, the Trade Secrets are kept behind three layers of institutional security.  (*Id.* at ¶ 48.)  <u>First</u>, the ADCS database schema is stored on a password-protected Team Foundation Server ("TFS") that is accessible to only a half dozen CACI software developers and testers.  (*Id.*

---

[3] CACI reserves the right to identify additional trade secrets at issue in this case, based on additional information obtained in discovery.

at ¶ 49.)  CACI also stores the ADCS source code on the TFS.  (*Id.*)  The TFS logs every important action of its users, including when they log in or out, when they download or upload source code, and when they make any changes to ADCS.  (*Id.*)  <u>Second</u>, the TFS itself is hosted on CACI's dedicated host server, which is password-protected and limited to under a dozen users.  (*Id.* at ¶ 50.)  This host server runs a test version of ADCS and its database, but only eight CACI users have access to that database and its schema.  (*Id.*)  <u>Third</u>, to access any CACI network domain, including the TFS and the host server, a user must log into the CACI domain over an encrypted connection.  (*Id.* at ¶ 51.)  Logging into the CACI domain requires both a login and two-factor authentication using CACI-generated security tokens.  (*Id.*)

2.  *CACI's Confidentiality Markings*

CACI also marks ADCS with confidentiality designations that are both embedded within the source code and visible to users of the application.  (*Id.* at ¶ 52.)  For example, ADCS users are presented with a banner that reads: "CACI PROPRIETARY AND CONFIDENTIAL – CACI TRADE SECRET" and "© 2022 CACI, INC. – FEDERAL" on the ADCS log-in page, as well as in other portions of the user interface.  (*Id.*)  Moreover, when CACI releases updates to ADCS, those materials are transmitted over an encrypted, secure channel, with the release notes and correspondence that accompany those updates also bearing confidentiality designations.  (*Id.* at ¶ 53.)  The same confidentiality designation appears on the face of CACI's presentations and training materials regarding ADCS, as well as in the ADCS source code itself.  (*Id.* at ¶¶ 52-53.)

3.  *CACI's Communications with USN Regarding the Confidential Nature of the Trade Secrets*

CACI also puts its customers on notice that ADCS contains confidential trade secret information, and that it must be treated as such.  (*Id.*)  CACI's agreement with USN, for example, expressly states that information provided as "part of the ADCS application, [and] its

documentation or associated materials or pertaining to it" are "proprietary information [that] is the sole property of [CACI]." (Smarr Decl. ¶ 5.) Further, when CACI has provided ADCS to USN, access to anything beyond the user interface is highly restricted. Indeed, only two USN employees—ADCS System Administrator (Matthew Sines) and ADCS Database Administrator (Lesa Mitchell)—are granted administrative access to ADCS's database, and that is only because they are responsible for administering the ADCS database on USN's servers. (Kalas Decl. ¶ 54.)

Further, when it is necessary to exchange information about the Trade Secrets, CACI requires its customers to use a secure, encrypted file-transfer service. (*Id.* at ¶¶ 53, 55.) For example, CACI Software Engineer Dexter Francis ("Francis") expressly reminded Matthew Sines ("Sines") of that requirement as recently as November 2022. (Francis Decl. ¶ 7.) Specifically, in an initial email on November 16, 2022, Sines pasted a small portion of the ADCS relational database schema and asked Francis for instructions on how to modify it. (Kalas Decl. ¶ 55.) Francis responded by firmly reminding Sines that: (1) the schema script contains "CACI Trade Secret Information" that "cannot be shared with or sent to any Government Contractor either directly or indirectly"; (2) all ADCS code and schema must be marked as proprietary, confidential and trade secret; and (3) email was an insecure and inappropriate means to send the script. (*Id.*) Francis also declined to answer Sines' question about how to modify the schema, instead noting that CACI itself would make any necessary updates. (*Id.*) As such, CACI unquestionably has put USN on notice of the highly confidential trade secret information contained in ADCS.

4.   *CACI Foregoes Commercial Opportunities That Would Require Disclosing the Trade Secrets*

CACI also has chosen to forego commercial opportunities where it felt that doing so put its Trade Secrets at risk. For example, in 2016, USN's COMFRC asked CACI to divulge the Trade Secrets to a competitor as a condition for entering into a new contract. (*Id.* at ¶ 56.) (*Id.*) CACI

refused, and with no contract renewal, ADCS automatically disabled itself at the end of a paid subscription period, forcing USN to suspend aircraft depot maintenance operations in the entire continental U.S. and Hawaii.  (*Id.*)  Repair operations resumed two days later only after USN renewed its subscription with CACI—and with CACI's Trade Secrets still protected from its competitors.  (*Id.*)[4]

> 5.    *Previous Threats to the Trade Secrets Confirm that USN Appreciated That ADCS Contained Trade Secrets*

Until the instant dispute with USN, CACI is aware of only three USN individuals having gained (or attempted to gain) unauthorized access to ADCS in twenty years.  (*Id.* at ¶ 58.)  The first instance was in or around 2004, when an aircraft manufacturer's employee attempted unsuccessfully to take a machine with ADCS on it out of the Jacksonville, Florida USN facility.  (*Id.*)  In that instance, USN revoked that employee's access to the base.  (*Id.*)  Second, in or around 2005, an active duty naval officer provided a third-party contractor with a portable computer which held a computer-readable version of the ADCS software.  (*Id.* at ¶ 59.)  Once alerted, USN not only forced the officer to immediately return the copy of ADCS, and to certify that ADCS had not been accessed by the third party, but it also investigated the incident under the Uniform Code of Military Justice.  (*Id.*)

Finally, in 2012, a third-party contractor in San Diego, California briefly viewed a small portion of the trade secret information related to a particular airplane.  (*Id.* at ¶ 60.)  The software was quickly returned once CACI identified the breach.

---

[4] In another example, a commercial airline and potential customer of ADCS asked CACI to demonstrate the software application under conditions that CACI deemed insecure.  (*Id.* at ¶ 57.)  CACI refused, and required the prospective customer to agree to different conditions in order to better protect the Trade Secrets.  (*Id.*)  When the customer would not do so, CACI declined to pursue the potential contract.  (*Id.*)

In short, just as CACI has vigilantly protected its Trade Secrets, USN similarly has responded appropriately when isolated threats to the Trade Secrets have arisen in the past.  As described below, however, the same cannot be said of USN's response to the present situation, notwithstanding the direct, documentary proof that USN personnel have disclosed CACI's Trade Secrets to third parties, and CACI's repeated efforts to get USN to correct the situation.

### E. The Ongoing Improper Use and Dissemination of the Trade Secrets and USN's Utter Disregard for its Duty to Respond

As described above, on November 22, 2022, Sines of USN emailed CACI asking how to modify a script that he had pasted in his email.  *See supra* at Section II.D.3.  CACI replied swiftly, confirming the confidential nature of the ADCS database schema, reminding Sines to use a more secure method of transmitting such sensitive material, and declining his request.  *See id.*  Given the apparently isolated nature of the incident, however, as well as the small amount of trade secret information involved, CACI assumed, at the time, that Sines' email was the result of inadvertence by USN and not part of a larger problem.[5]  (Kalas Decl. ¶ 55.)  Nevertheless, out of an abundance of caution, CACI provided USN with a script file that would apply confidentiality markings to the metadata associated with the ADCS database tables, *i.e.*, trade secret information.  (*Id.* at ¶ 62.) CACI provided that script to supplement the identical notices that already appeared on the ADCS user interface, so as to protect against any further missteps by any USN personnel.  (*Id.*)

On December 14, 2022, however, a different USN employee informed CACI that USN refused to execute that script.  (*Id.* at ¶ 63.)  Concerned by that response, on December 16, 2022, CACI sent a Letter of Concern to the USN contracting officer, Lydia Munley ("Munley").  (Smarr Decl. ¶ 10, Ex. SM-1.)  In that letter, CACI reiterated the confidential nature of the Trade Secrets,

---

[5] Given that Sines later helped expose USN's wrongful conduct, CACI still has no reason to believe differently regarding Sines' November email.

expressed its dismay that USN was disseminating "CACI's highly proprietary Database Schema" without appropriate confidentiality notices, and informed USN that "the Government does not have the right to modify CACI's licensed ADCS so the script must be put through." (*Id.*)

USN responded over a month later, on January 19, 2023, by raising a host of questions for CACI. (*Id.* at ¶ 11, Ex. SM-2.) Notwithstanding the delay, CACI took the response as a good sign and prepared a detailed response, which it ultimately provided on February 16, 2023. (*Id.* at ¶¶ 12-13, Ex. SM-4.) The situation, however, rapidly degenerated thereafter. On February 14, 2023, Sines again emailed CACI, this time asking CACI's Matthew Strand ("Strand") to confirm what type of information he was authorized to share regarding ADCS. (Strand Decl. ¶ 8; Ex. K-3.) Sines also explained that he had received what he thought were improper requests for information regarding ADCS. (*Id.* at ¶ 9; Ex. K-3.)

Sines' concerns were well-founded. CACI soon learned that multiple USN personnel[6] had asked Sines for information regarding ADCS's database "in response to requests from a contractor named George Rice ["Rice"]."[7] (*Id.* at ¶ 10; Ex. K-3.) Sines also had received a separate request from Rice who, along with USN's Jon Gabiou ("Gabiou"), asked for information regarding the ADCS database—a request that Sines considered "very peculiar and like a probe to elicit design structure of ADCS." (*Id.* at ¶ 9; Ex. K-3.) In fact, as shown in a Teams chat session involving Gabiou, Rice and Sines, Gabiou specifically sought the tool with which Sines administers the ADCS database, as well as ADCS's "full data dictionary of all tables," all of which would disclose the Trade Secrets. (*Id.* at ¶ 12; Ex. K-5.) Equally concerning, Sines reported that Rice, a third-

---

[6] Those personnel were USN's Charles Nebraski ("Nebraski"), Corey Cook, and Barbara Leedy, none of whom shared Sines' back-end access to ADCS. (Strand Decl. ¶ 10.)

[7] George Rice ("Rice") is an employee of Deloitte Consulting LLP ("Deloitte"), which is a USN contractor with system integration responsibilities for the Navy Depot Maintenance System ("NDMS"). (*Id.* at ¶ 9.)

party contractor, had been given access to the ADCS test environment that was running on USN's server.  (*Id.* at ¶ 11.)

Understandably alarmed, CACI immediately investigated the situation.  (*Id.*)  Within two days, CACI learned that Rice had not only gained access to the ADCS test environment, but also had been given aircraft system administrator privileges to ADCS.  (*Id.*; Francis Decl. ¶ 8.)  CACI also learned that it was USN's Nebraski who had extended such broad access to Rice.  (Strand Decl. ¶ 11.)  Remarkably, the degree of access that Rice received went well beyond that of an ordinary USN user: Rice's access gave him broad insight into how ADCS functioned and was structured, and revealed to Rice that he needed more information—namely, a data dictionary—in order to rapidly replicate ADCS capabilities in competing software.  (*Id.*)

On February 16, 2023, CACI also became aware of a separate request by Gabiou that, if granted, would have generated a data dictionary from CACI's database.  (Kalas Decl. ¶ 71.)  That information would have provided the key that, together with the information that Rice had been able to glean as described above, would reveal the Trade Secrets.  (*Id.* at ¶¶ 39, 71.)  In short, the requested information would pave the way for USN and its contractors to reverse-engineer ADCS.  (*Id.* at ¶ 69.)  In light of the foregoing, CACI responded urgently to the email by stating: "Please do not comply with this request.  This is not a simple data request.  This request will expose CACI's intellectual property."  (*Id.* at ¶ 71.)

On that same day, CACI also emailed Munley to notify her of Gabiou's improper request and its damaging implications.  (Smarr Decl. ¶ 15, Ex. SM-6.)  CACI expressly explained that "[t]he data dictionary that would be generated by [Gabiou's query] will expose CACI's IP of the database schema.  Specifically, the data dictionary would expose database column names, systems table descriptions, constraints/restrictions on the tables, and descriptions of all the database

properties. All of this information is proprietary to CACI. This would allow Gabiou to reverse engineer our copyrighted product." (*Id.* at Ex. SM-6.)

At the same time, CACI also issued a formal cease-and-desist letter. (*Id.* at ¶ 13, Ex. SM-4.) In that letter, CACI set out what it had learned in the two preceding days, namely that Nebraski had provided unauthorized access to the ADCS test environment to a third-party contractor and that Gabiou sought to reproduce CACI's entire database schema, all as part of an effort to replace ADCS. (*Id.*) It further explained the irreparable harm that CACI would incur if its Trade Secrets were to be exposed, and stated in no uncertain terms: "CACI respectfully requests that the Government and its contractors cease and desist providing unauthorized access to and use of ADCS Software and Database Schema (which includes database tables and keys), as well as access to and the use of the ADCS Test Environment." (*Id.*)

In the following days, CACI and USN engaged in a flurry of correspondence. Initially, USN took steps indicating that it would cooperate with CACI to protect the Trade Secrets. For instance, in response to a February 21, 2023 email from CACI, Munley confirmed the next day that "Rice's access to the ADCS test environment has been removed." (*Id.* at ¶ 14, Ex. SM-5.) CACI took that report as a promising sign.

Another bomb, however, dropped on February 22, 2023. At that time, CACI received a screenshot revealing that its Trade Secrets had been published to a group of USN and third-party employees tasked with planning a transition from ADCS to another software solution (the "Transition Group"). (*Id.* at ¶ 15, Ex. SM-7.) Specifically, USN personnel had uploaded portions of the Trade Secrets to the Transition Group's shared Confluence website (the "Confluence Site") and presented that trade secret information to the group. (Kalas Decl. ¶¶ 72, 74.) According to Sines, this group included over 60 people. (Strand Decl. ¶ 16.)

14

In addition to displaying at least some of the trade secret information, the presentation shown in the screenshot explained how the ADCS database schema could be incorporated into USN's "Shopfloor Control System" ("SFCS" or Maintenance Repair and Overhaul ("MRO")) software—*i.e.*, how USN and its contractors intended to use the Trade Secrets to reverse engineer ADCS and incorporate it into a competing product. (Kalas Decl. ¶¶ 77-78.) USN personnel shared all of that information with the third-party contractors who had access to the Confluence Site. Immediately on February 22, 2023, upon learning this new information, CACI alerted Munley of the disclosure and demanded that USN "direct its employees to immediately cease and desist from using or accessing ADCS proprietary information that is contained [on the Confluence Site]." (Smarr Decl. ¶ 15, Ex. SM-7.)

Just how the Transition Group had obtained the Trade Secrets, however, remained unclear until the following day. On February 23, 2023, Sines told Strand that Gabiou had finally succeeded in running the query that Sines himself had declined to run. (Strand Decl. ¶ 15; Ex. ST-1.) Gabiou had done so by circumventing Sines altogether, instead appealing to Lesa Mitchell ("Mitchell")— the only other USN employee with full administrative-level access to the ADCS database. Mitchell granted Gabiou access to read the entire ADCS database and run his query to extract the Trade Secrets. (*Id.* at ¶ 11.) Sines provided CACI with images of Teams chat messages from Gabiou, in which Gabiou shared the database query he used to extract ADCS's "data dictionary" of table and column names, and then admitted to posting that information on the Confluence Site. (*Id.* at ¶¶ 14-15; Ex. K-6.)

Upon learning that Gabiou had stolen and published the Trade Secrets, just as CACI had warned he was trying to do days earlier, CACI reached out again by email and telephone to Munley, this time on February 23, 2023. (Smarr Decl. ¶ 15, Ex. SM-8.) CACI explained what

15

Gabiou had done and demanded that: (1) Gabiou's improper access to the ADCS database be revoked; (2) the Trade Secrets be taken down from the Confluence Site; (3) all copies of the Trade Secrets be destroyed; and (4) USN investigate the misappropriation of the Trade Secrets.  (*Id.*) CACI also reiterated the confidential and proprietary nature of the Trade Secrets.  (*Id.*)[8]

The next day, February 24, 2023, CACI elevated the issue to Munley's supervisor, Meghan Huett, speaking with her by phone and reiterating CACI's demands.  (*Id.* at ¶ 16, Ex SM-9.)  In response, USN stated that Gabiou's access to ADCS would be revoked that day, but remained silent on whether the Trade Secrets had been removed from the Confluence Site.  (*Id.*)  At the same time, CACI and its outside counsel also turned their attention to USN's in-house counsel, William Mohn ("Mohn"), in order to spur corrective action by USN.  (Giese Decl. ¶ 7, Ex. G-1.)

In the days that followed, CACI followed up regularly with Mohn, repeatedly identifying the corrective measures that needed to be taken and seeking updates on the progress that had been made toward resolving CACI's concerns.  (*Id.* at ¶¶ 7-22.)  And, initially, incremental progress was made.  For instance, by phone on February 28, 2023, CACI demanded that USN: (1) discontinue third-party access to the Trade Secrets; (2) destroy any copies of the Trade Secrets; (3) remove the Trade Secrets from the Confluence Site; (4) disband the Transition Group (which, as recently as February 27, 2023, had continued to meet) (*see* Strand Decl. ¶ 16; Ex. ST-2); and (5) send outside contractors notices directing them not to access the Trade Secrets.  (Giese Dec. ¶ 8; Ex. G-2.)  In response, Mohn agreed to act promptly on those requests.  (*Id.*)  The next day, in fact, Mohn confirmed that USN had removed CACI's trade secret information from the Confluence Site—albeit only after it had been posted there for at least eight days.  (*Id.*)  Along

---

[8] On February 22 and 23, 2023, CACI's outside counsel sent cease and desist letters directly to each of the third-parties that it understood were exposed to the Trade Secrets via Confluence, including Deloitte.  (Giese Decl. ¶¶ 5-6.)

with the revocation of Rice's and Gabiou's access to ADCS, these developments encouraged CACI to continue working toward resolution with USN.

Mohn's responsiveness, however, began to dwindle.  For instance, in a phone call on March 9, 2023, Mohn stated that he could not confirm what trade secret information Rice might have copied while he had unauthorized access, nor whether other individual contractors' access had been revoked.  (*Id.* at ¶¶ 13-14, Ex. G-3.)  He further stated that USN had not yet (1) sent the written notices that CACI had prepared for USN's contractors; (2) conducted an internal investigation to find remaining copies of any trade secret information on its system or employee laptops; (3) identified which Transition Group members had access to the Trade Secrets; or (4) advised the Transition Group members to stop the use and dissemination of any trade secret information that they had in their possession.  (*Id.*)

To be clear, the need for such corrective measures was hardly academic.  Indeed, evidently, when USN finally made some internal inquiries, it came to light that Gabiou had downloaded a large portion of the ADCS database schema to his individual laptop.  Nonetheless, Mohn's progress all but grinded to a halt, and he grew increasingly resistant to cooperating or even communicating with CACI on the matter.  (*Id.* at ¶¶ 18, 20.)  That situation came to a crescendo on March 22, 2023, when CACI and its outside counsel telephoned Mohn for an update on his efforts to cabin CACI's Trade Secrets—something that Mohn had never previously provided in writing, despite numerous emails from CACI in the preceding weeks.  (*Id.* at ¶ 18.)  Three minutes into the call, Mohn hung up on CACI and its counsel, declaring that all further communications on the matter must be in writing.  (*Id.*)

On March 23, 2023, CACI followed up with Mr. Mohn by email.  (*Id.* at ¶ 18, Ex. G-2.) Mr. Mohn only responded by stating, via email on March 27, 2023, that "[t]he Navy will respond

when appropriate." (*Id.*)  In reply, CACI reiterated that "CACI appreciates the initial steps you have taken to date" to prevent further dissemination of the Trade Secrets, and that "[w]e [CACI] would like to work with [USN] to resolve this." (*Id.*)

After further email exchanges on March 30, April 3 and April 5, 2023, Mr. Mohn stated in an April 5, 2023 email that "the Navy will respond by 7 April." (*Id.* at ¶ 19, Ex. G-4.)  On that date, Mr. Mohn sent an email indicating that USN had "reviewed [CACI's] concerns and demands," but intended to nevertheless carry on with "[t]he transition to a new Government system to replace ADCS." (*Id.*)

## III.    THE APPLICABLE LEGAL STANDARDS

### A.    The Preliminary Injunction Standard

A preliminary injunction may either be mandatory—requiring that some action be taken— or prohibitory—preventing some action from being taken. *Salient CRGT, Inc. v. Sols. By Design II, LLC*, No. 1:20-cv-236 (RDA/TCB), 2020 WL 3550008, at *4 (E.D. Va. Apr. 2, 2020) (citing *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 235 (4th Cir. 2014)).  Courts grant mandatory preliminary injunctions "when the exigencies of the situation demand such relief." *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 703 (E.D. Va. 2000) (citing *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)).  Whether a preliminary injunction should be granted "is committed to the sound discretion of the trial court." *See H. Jay Spiegel & Assocs., P.C. v. Spiegel*, 652 F. Supp. 2d 630, 633 (E.D. Va. 2008) (quotation omitted).

Courts have recognized that such exigencies often arise in cases involving trade secret violations. *See, e.g.*, *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 521 (E.D. Va. 2021) (granting requested mandatory preliminary injunction to enjoin defendant's use or disclosure of trade secret because it would "essentially force [the defendants] to . . . preserve the status quo for the Parties."); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, No. SAG-22-

00176, 2022 WL 326473, at *7 (D. Md. Feb. 3. 2022) (granting mandatory preliminary injunction and noting: "[C]ourts have repeatedly concluded that wrongful utilization of a competitor's confidential and proprietary information favors injunctive relief."). Indeed, courts routinely recognize the need for preliminary relief in trade secret cases because of the unique and special harm that can result from the misappropriation of those trade secrets. *Cap. One Fin. Corp. v. Sykes*, No. 3:20-cv-763, 2021 WL 2903241, at *13 (E.D. Va. July 9, 2021) ("The disclosure of trade secrets establishes immediate irreparable harm because a 'trade secret, once lost is, of course, lost forever.'" (quoting *Acierno v. New Castle Co.*, 40 F.3d 645, 664 (3d Cir. 1994)).

Fed. R. Civ. P. 65 provides the standard by which a court reviews a motion for a preliminary injunction. *Amarasinghe v. Quinn*, 148 F. Supp. 2d 630, 632-33 (E.D. Va. 2001). Under Rule 65, the movant bears the burden of showing: "(1) 'that he is likely to succeed on the merits,' (2) 'that he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in his favor,' and (4) that a preliminary injunction 'is in the public interest.'" *Stewart v. Lee*, No. 1:16-cv-213 (LMB/JFA), 2016 WL 8345463, at *1 (E.D. Va. June 15, 2016) (quoting *Winter v. Nat. Res. Def. Council. Inc.*, 555 U.S. 7, 22 (2008)). "No single factor can defeat a motion for a preliminary injunction"; rather, courts must examine the "flexible interplay" among all of the factors. *H. Jay Spiegel*, 652 F. Supp. 2d at 634 (quoting *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977)).

**B.      The Administrative Procedures Act (APA)**

The APA provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. A litigant may obtain judicial review for a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An action is final if the agency has

completed its decision-making process and its decision directly impacts the parties. *Shurland v. Air Force Bd. for Corr. of Mil. Recs.*, No. 3:18cv770, 2019 WL 5410064, at *4 (E.D. Va. Sept. 24, 2019) (citation omitted); *see also Ayers v. U.S. Dep't of Def.*, No. 7:18-cv-0032, 2019 WL 4145240, at *5 (W.D. Va. Aug. 30, 2019) (noting that a final agency action is one with "'sufficiently direct and immediate' impact on the aggrieved party and a 'direct effect on [its] daily business.'" (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))).  A court is empowered to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (2)(A).

Courts routinely have found that an alleged violation of the TSA is a reviewable agency action under the APA.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979) (concluding that the government's "decision to disclose" Chrysler's confidential information, allegedly in violation of the TSA, was "reviewable agency action"); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 966-67 (D.C. Cir. 1982) (noting that the Supreme Court found that a TSA violation could supply a cause of action for an aggrieved party under the APA); *Blackhawk Indus. Prods. Grp. Unlimited, LLC v. U.S. Gen. Servs. Admin.*, 348 F. Supp. 2d 662, 666 (E.D. Va. 2004) (same).  In particular, a violation of the TSA is reviewable as an action "not authorized by law," providing a private cause of action under the APA.  *Megapulse*, 672 F.2d at 966-67; *see also* 5 U.S.C. § 706(a)(2) (providing review for agency action "not in accordance with law").

### C.    The Trade Secrets Act

The TSA prohibits an agency from "publish[ing], divulg[ing], disclos[ing], or mak[ing] known in any manner . . . information concern[ing] or relat[ing] to the trade secrets . . . [to] any person except as provided by law[.]"  18 U.S.C. § 1905.  Thus, if the Government obtains trade

secret information from a third party and discloses that information without authorization, it violates the TSA.  *Dowty Decoto, Inc. v. Dep't of Navy*, 883 F.2d 774, 775-76 (9th Cir. 1989) (finding that the Navy violated the TSA by disclosing the plaintiff-contractor's technical information);  *see also Env't Tech. Inc. v. Env't Prot. Agency*, 822 F. Supp. 1226, 1228-29 (E.D Va. 1993) (any disclosure of information that "is of a kind that the provider would not customarily release to the public" violates the TSA).  In addition, courts have interpreted the TSA to prohibit the unlawful "use" of another's trade secret.  *See, e.g.*, *Mgmt. Sci. Am., Inc. v. Pierce*, 598 F. Supp. 223, 231 (N.D. Ga. 1984) (stating that, if the Government "seeks or proposes to use or release [trade secret information], Plaintiff would clearly have a cause of action in this court under 5 U.S.C. § 702 and 18 U.S.C. § 1905 (citing *Chrysler Corp v. Brown*, 441 U.S. 281 (1979)); *CACI v. Field Servs., Inc. v. United States*, 12 Ct. Cl. 440 (1987) (stating that a policy goal of § 1905 is that "certain commercially valuable or sensitive information may be preserved from unauthorized use").

To constitute a trade secret, the subject information must have "independent economic value, actual or potential, from not being generally known," and is valuable because third parties do not have access to it.  18 U.S.C. § 1839 (3)(B); *accord* Va. Code § 59.1-336; Restatement (Third), of Unfair Competition § 39 cmt. e (Am. L. Inst. 2023) ("A trade secret must be of sufficient value in the operation of a business or other enterprise to provide an actual or potential economic advantage over others who do not possess the information.").  Such information can come in many forms, including as database schema.  *Versata Software, Inc. v. Internet Brands*, Inc., 902 F. Supp. 2d 841, 852 (E.D. Tex. 2012) (parties did not dispute that a "'database schema,' which describes how the data used in the software is arranged and details the relationships between different data elements," was a trade secret); *accord List Interactive, Ltd. v. Knights of Columbus*,

No. 17-CV-00210-RBJ, 2019 WL 2248547, at *5 (D. Colo. May 24, 2019) (parties did not dispute that a database schema could be a trade secret).

## IV.    ARGUMENT

Even at this early stage in the case, the evidence is overwhelming that ADCS's database schema constitutes a trade secret, and that USN violated the TSA—giving rise to a cause of action under the APA—when it blithely downloaded and made the Trade Secrets available to third-party contractors.  Indeed, that improper use and disclosure is well documented.  If USN is not required to stop its improper use and disclosure of the Trade Secrets, then CACI will be irreparably harmed because it will irretrievably lose work that has taken decades to develop, and that its competitors are unable to replicate.  Under such circumstances, the balancing of the harm to CACI vastly outweighs any theoretical harm to USN.  That is particularly true because CACI neither seeks to block USN's proper use of ADCS, nor does it seek to block legitimate efforts by USN to find an alternative to ADCS.

### A.    CACI's TSA Claim for Injunctive Relief is Reviewable Under the APA

This case is properly before this Court as a claim of unlawful agency action under the APA because, as argued below, USN's disclosure of the Trade Secrets constitutes a violation of the TSA.  18 U.S.C. § 1905; *see infra* at IV.B.  It is well-settled that a government action that violates the TSA is a reviewable action that shall be set aside as "not in accordance with law," and is "properly enjoinable."  *Dowty Decoto*, 883 F.2d at 775-76; *see* 7 U.S.C. § 706(2)(A); *Chrysler*, 441 U.S. at 318; *Megapulse*, 672 F.2d at 966-67; *Blackhawk Indus. Prods.*, 348 F. Supp. 2d at 666.[9]

---

[9] The fact that USN and CACI are parties to a contract does not change this conclusion.  *See Megapulse*, 672 F.2d at 969 (concluding that the "mere existence of ... contract-related issues" did not convert the action to one that fell outside the APA because the claim was "based, not on breach of contract, but on an alleged governmental infringement of

**B.      CACI Is Likely to Succeed on the Merits of its TSA Claim**

ADCS's database schema is a valuable trade secret that USN personnel have brazenly downloaded and published to third parties, and USN has refused to take the steps necessary to prevent the further disclosure of the Trade Secrets, or even investigate whether further disclosures already have occurred.  Such behavior plainly violates the TSA.

1.      *CACI Holds Valuable, Protectable Trade Secrets in the ADCS Database Schema and the Information That Can Be Gleaned From It*

It cannot reasonably be disputed that ADCS's database schema fits within the definition of a trade secret.  ADCS is the result of decades of work and millions of dollars in investments.  The Trade Secrets represent a vast amount of judgment and ingenuity to join a massive number of disparate datatypes into a cohesive, interrelated whole.  Further, as ADCS has grown, the connections between datatypes have grown exponentially, resulting in an intricate network of virtual datatypes that simply cannot be replicated without access to the Trade Secrets.

All of that work also has resulted in a uniquely successful commercial product.  There is a reason that ADCS has been a sole source software application for USN for over twenty years: by harnessing the power of its lateral methodology architecture, CACI has created a product that far outpaces its competitors in performance and efficacy.  Fundamentally, ADCS allows its users to perform inspection and maintenance operations on aircraft in a highly efficient and safety-focused manner, allowing operators to begin work on an aircraft at any point of entry, knowing that ADCS will guide them through all the areas of the aircraft that need to be evaluated.  No other product on the market remotely provides that level of performance.

---

property rights and violation of the Trade Secrets Act"); *Crowley Gov't Servs., Inc. v. Gen Servs. Admin*., 38 F.4th 1099, 1106, 1113 (D.C. Cir. 2022) (holding that a suit for injunctive relief is properly brought under the APA where it is not "in essence" a contractual claim).

The value derived from the Trade Secrets' secrecy also cannot be disputed.  A competitor with access to the ADCS database schema would be able to understand how ADCS has leveraged its lateral methodology architecture to create its highly complex network of interconnected pieces of information.  (Kalas Decl. ¶ 68.)  By examining the relationships between database elements in the schema, a competitor could reconstruct those relationships to build an alternative to ADCS.  (*Id.* at ¶ 70.)  As a result, the value of the Trade Secrets is equivalent to the value of ADCS, and that value would be lost if the Trade Secrets were disclosed.  (*Id.* at ¶ 39.)

It is because of the Trade Secrets' value that CACI has gone to great lengths to protect it.  The law requires that a trade secret owner take "reasonable measures to keep such information secret."  *See* 18 U.S.C. § 1839(3)(A); *accord* Va. Code § 59.1-336 (a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy").  That "secrecy, however, need not be absolute."  Restatement (Third) of Unfair Competition § 39 cmt. f (Am. L. Inst. 2023) ("The rule stated in this Section requires only secrecy sufficient to confer an actual or potential economic advantage upon one who possesses the information."); *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) ("[O]nly reasonable efforts must be taken to maintain secrecy.").

Here, CACI has protected the secrecy of its Trade Secrets by, among other things, requiring CACI personnel to access three secure CACI network domains before they can even view the Trade Secrets.  *See* Section II.D.1.  Fewer than a half dozen individuals at CACI have the access needed to view the ADCS database schema, which requires clearing three separate password-protected gates all over an encrypted network tunnel.  Every interaction those users have with the database schema (*e.g.,* reading and editing) is logged.

24

When CACI has provided access of ADCS to USN—which CACI must do for USN to be able to deploy the software—access to the software is highly restricted. *See* Section II.D.3. Only two individuals hold administrative access to the ADCS database and that is only because such access is necessary for USN to be able to operate the software. No one else at USN was supposed to gain access to the ADCS database. Such allowances are reasonable in the eyes of the law. *See Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 574 (E.D. Va. 2004) ("[T]he owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied." (citation omitted)).

CACI also marks USN's copy of ADCS with designations that make clear that its contents are proprietary and confidential. The ADCS user interface expressly states that the software contains "PROPRIETARY AND CONFIDENTIAL" material, including "CACI TRADE SECRET[S]." *See* Section II.D.2. When CACI releases updates to ADCS or its database, those materials are transmitted over an encrypted, secure channel, and release notes and correspondence that accompany those updates also bear a confidentiality designation. Likewise, CACI presentations, including training documents, regarding ADCS bear a confidentiality designation.

CACI's communications with USN also reflect its commitment to protecting the secrecy of its Trade Secrets. Every software update and communication regarding those updates bears a confidentiality designation. And, as discussed above, CACI has immediately responded to and firmly addressed instances where USN has put the Trade Secrets at risk in the past. *See* Section II.E.

As such, ADCS's database schema unquestionably is protectable as trade secret information. In fact, this element is so clear that, during discussions with USN's legal counsel, he

never once disputed that CACI's database schema qualified as trade secret information.  (Giese Decl. ¶ 22.)

### 2.    *USN Wrongfully Used and Disclosed the Trade Secrets*

Sometime apparently in 2022,[10] personnel within USN created the Transition Group, which is a working group created with the express purpose of "sunsetting" ADCS and replacing it with another product.  The Transition Group is comprised of approximately 60 members, many of whom represent third-party contractors that provide services and products to the USN.

Because early efforts by the Transition Group to sunset ADCS appear to have been unsuccessful, at some point in the process, at least one Navy personnel—Gabiou—decided to take matters into his own hands.  Initially, he pestered Sines to grant him access to ADCS's database schema, *i.e.* CACI's trade secret information, in connection with what Gabiou called his "ADCS extract effort."  *See* Section II.E.  Sines, sensing that something was amiss, asked CACI about Gabiou's request, and when CACI quickly responded that Gabiou's request was inappropriate, Sines was able to successfully fend off Gabiou's repeated efforts.

Undeterred, Gabiou turned to the only other USN employee with administrator access to the ADCS database—Mitchell.  Regrettably, Mitchell was not as responsible as Sines, and acceded to Gabiou's demands.  Mitchell granted Gabiou access to read the entire ADCS database, and Gabiou proceeded to extract at least a large portion of the database schema and publish it on the Confluence Site.  Once published, every one of the 60 members of the Transition Group, including third-party contractors, had unfettered access to CACI's trade secret information.  And to be clear, Gabiou was unabashed in stealing CACI's trade secret information, at one point even gloating to Sines that he had secured access to CACI's valuable information.  (*See* Strand Decl. ¶¶ 13-15, Ex.

---

[10] CACI became aware of the Transition Group in February 2023, but does not know precisely when it was created.

K-6.)  As a result of Gabiou's efforts, the Trade Secrets became available to a number of CACI's competitors.

The damage that Gabiou caused could have been reduced, however, if USN had acted responsibly in the face of Gabiou's highly inappropriate behavior—as it had in the past.  Once CACI became aware of Gabiou's intentions in February 2023, CACI acted quickly, demanding immediate action to forestall the unconstrained dissemination of its Trade Secrets.  Initially, USN legal personnel seemed receptive and claimed to have both revoked Gabiou's access to ADCS and taken the Trade Secrets off the Confluence Site.  Shortly thereafter, however, USN legal personnel became recalcitrant and uncooperative, at one point hanging up on CACI after falsely claiming that CACI had wrongly documented a prior conversation.  In the end, USN legal counsel either did not understand the seriousness of the situation or was unable to control USN personnel.  In any event, given the opportunity to correct USN's grievous behavior, USN's legal counsel either was unwilling or unable to do so.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

Having established the validity of the Trade Secrets and that USN both used and published them without permission, CACI clearly has established a likelihood of success under the TSA.  A violation of the TSA, in turn, constitutes a violation of the APA.  *See, e.g.*, *Dowty Decoto*, 833 F.2d at 781; *Megapulse*, 672 F.2d at 959.  As such, the "likelihood of success" prong weighs heavily in CACI's favor.

### C.    CACI Is Likely to Suffer Irreparable Harm Absent an Injunction

"The disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'"  *Home Funding Grp., LLC v. Myers*, No. 1:06cv1400 (JCC), 2006 WL 6847953, \*2 (E.D. Va. Dec. 14, 2006) (quoting *Acierno v. New Castle Co.*, 40

F.3d 645, 664 (3d Cir. 1994)).  Such harm by its very nature is irreparable and, as such, courts often conclude that the disclosure of trade secrets results in irreparable harm.  *Cap. One*, 2021 WL 2903241, at *14 ("[O]nce confidential information is disclosed to a competitor, the information cannot regain its secret status.").

That is certainly the case with CACI's Trade Secrets.  Access to the Trade Secrets unlocks the work that CACI has performed over two decades, at considerable expense and as a result of substantial creativity and hard work.  CACI's competitors have not been able to replicate ADCS's performance without access to the Trade Secrets, giving CACI a distinct advantage in the marketplace.  Unfettered access to the Trade Secrets, however, would permanently destroy that advantage, and the harm to CACI would be irreparable.  *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("[A] loss [that] is difficult to replace or difficult to measure [is irreparable]."); *Conax Fla. Corp. v. United States*, 625 F. Supp. 1324, 1327 (D.D.C. 1986) (holding that the "government's disclosure of the unique data developed at plaintiff's time, effort and expense will cause irreversible harm in that it will suffer the loss of its sole source position in the government market, loss of its competitive edge as a leader in this market," and other harms).

Further, the present risk to CACI is "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and citation omitted).  USN personnel have already made the Trade Secrets available to third-party contractors, and USN's legal counsel is either unwilling or unable to correct USN's egregious breach of CACI's legal rights.  Unless this Court acts promptly, there simply will be no secret left to preserve, and the Trade Secrets will be lost forever.

**D.     The Balance of Equities Tips Heavily in CACI's Favor**

"[A] balancing of the equities strongly favors granting an injunction to foreclose [a party] from benefitting from [its] misappropriation of [another's] trade secrets," and such is the case here. *API Tech. Servs., LLC v. Francis*, No. 4:13-cv-142, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (quoting *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012)).  If an injunction is not entered, CACI would lose its Trade Secrets, and with them the fundamental advantage that it possesses in the marketplace.

Further, CACI simply seeks to restore the *status quo ante*.  It wants both parties to be put in the positions they were in before USN started improperly disclosing the Trade Secrets.  Such relief is appropriate on a motion for a preliminary injunction.  *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017) (the purpose of a preliminary injunction is to maintain the parties' prior positions and, as such, an injunction can "act to restore, rather than merely preserve, the status quo" (citations omitted)); *Blackhawk*, 348 F. Supp. 2d at 655 (the purpose of a preliminary injunction is "'to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit.'" (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) (a preliminary injunction is proper when a party's action might "irreversibly alter the status quo.").

In contrast, USN stands to lose little if injunctive relief is granted.  CACI is not seeking to shut down USN's use of ADCS—something that would put both individual safety and national security interests in jeopardy.  Nor is CACI seeking to stop USN's efforts to replace ADCS generally, if that is what USN wishes to do.  All CACI seeks is to prevent USN from using the Trade Secrets to engineer that migration, and ensure that personnel who have been exposed to the trade secret information not be involved in those efforts, pending resolution of the underlying

dispute.  It is certainly the case that such an injunction could slow down USN's efforts or require it to subscribe to a lower quality product.  But the parties have been in privity with each other for over twenty years, and CACI is not aware of any reason for urgency in changing providers now.

Moreover, any potential hardship USN faces will be the result of its own wrongful conduct. "Such 'self-inflicted' harm is not enough to tip the equities in their favor."  *Cap. One*, 2021 WL 2903241, at *15 ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." (citation omitted)).

### E.      Injunctive Relief Is in the Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (internal quotation marks omitted)).  The public interests in play warrant an injunction.  Specifically, the Fourth Circuit recognizes that "public interest favors the protection of confidential business information," which CACI seeks to protect.  *Cap. One*, 2021 WL 2903241, at *15 (citing *Audio-Video Grp., LLC v. Green*, No. 1:14cv169, 2014 WL 793535, at *6 (E.D. Va. Feb. 26, 2014)).  Injunctive relief also would serve the public interest by maintaining enterprise software sold to USN and other governmental organizations.  The U.S. government relies upon such software, which supports public goals, including promoting national security.

## V.      CONCLUSION

For all the foregoing reasons, CACI respectfully requests that this Court grant the relief set for in the Motion it has filed contemporaneously with this Memorandum.

Dated: April 11, 2023

Respectfully submitted:

By: */s/ Mark H. Churchill*

Mark H. Churchill (VSB No. 42663)
David S. Black (VSB No. 40671)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard
Suite 1700
Tysons, VA 22102
Tel. 703.720.8600
Mark.Churchill@hklaw.com
David.Black@hklaw.com

Joshua C. Krumholz (*pro hac vice* forthcoming)
Jacob W. S. Schneider (*pro hac vice* forthcoming)
Courtney Batliner (*pro hac vice* forthcoming)
HOLLAND & KNIGHT LLP
10 St. James Ave.
11th Floor
Boston, Massachusetts 02116
Tel. 617.523.2700
Joshua.Krumholz@hklaw.com
Jacob.Schneider@hklaw.com
Courtney.Batliner@hklaw.com

*Attorneys for CACI, Inc. – Federal*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of April 2023, I served a copy of the foregoing

document on counsel for Defendant United States Navy at the following address:

General Counsel of the Navy
Naval Litigation Office
720 Kennon Street, S.E.
Room 233
Washington Navy Yard, D.C. 20374-5013

By:  */s/ Mark H. Churchill*
Mark H. Churchill

*Counsel for Plaintiff CACI, Inc. – Federal*

32